32 pgs -

RECEIPT NUMBER
505025 -

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

KAREN PATILLO

        Plaintiff,

v

JOHN E. POTTER,
POSTMASTER GENERAL,

UNITED STATES POSTAL SERVICE,

        Defendant,

Case No. **04-71070**
Hon.
Magistrate **PAUL D. BORMAN**

MAGISTRATE JUDGE R. STEVEN WHALEN

_____/

HELVESTON & HELVESTON, P.C.
Mary Anne M. Helveston (P37653)
65 Cadillac Square, Suite 3327
Detroit, Michigan 48226
(313) 963-7220

**FILED**

MAR 2 3 2004

CLERK'S OFFICE-DETROIT-PSG
U.S. DISTRICT COURT

## COMPLAINT AND JURY DEMAND

NOW COME Plaintiff KAREN PATILLO, by and through her attorneys, HELVESTON & HELVESTON, P.C., and complains against the defendant as follows:

### INTRODUCTION

1.    This is an action to enforce rights pursuant to Title VII of the Civil Rights Act of 1964 (Title VII) and the Civil Rights Act of 1991(CRA).

### PARTIES AND JURISDICTION

2.    Plaintiff KAREN PATILLO, a black female living in the city of Walled Lake, Country of Oakland, State of Michigan is an employee of the United States Postal Service.

3.    Defendant, JOHN E. POTTER, POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE, is Plaintiff's employer.

4.      The Equal Employment Opportunity Commission issued a Final Agency Decision dismissing Plaintiff's claims on January 22, 2004 and advised her that she had 90 days to file a claim in Federal Court.

5.      The amount in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest, costs and attorney fees.

## PROCEDURAL HISTORY

6.      From 1998 through 2002, Plaintiff filed numerous complaints of discrimination and retaliation with the EEOC.

7.      Some complaints were resolved, some withdrawn and the remaining complaints were consolidated into cases, EEOC case number 4-J-480-0027-99 filed on November 20, 1998 and EEOC case number 4-J-480-0016-02 filed on January 14, 2002.

8.      EEOC case numbers 4-J480-0027-99 and 4-J-480-0016-02 were dismissed in a Final Agency Decision was issued on January 22, 2004.

## GENERAL ALLEGATIONS

### Background Facts

9.      Plaintiff KAREN PATILLO began her employment with Defendant, on May 12, 1984 as a mail carrier in Pontiac, Michigan.

10.     Plaintiff remained in that position for eleven years.

11.     After successfully bidding on an open mail carrier position at the West Bloomfield Post Office, Plaintiff became the second African American female in an otherwise all white office.

12.     Defendant operates under a progressive discipline system.

13.     From 1984 until January 1995, Plaintiff's disciplinary record remained unblemished.

14.     Shortly after Joe Spiteri, a white male, became the branch manager of the West Bloomfield Post Office, Plaintiff began to be the subject of unwarranted discipline.

15.     On January 5, 1995, Plaintiff had pre-complaint counseling with the EEOC counselor after Spiteri and her white, male supervisor, Mike Losiowski, threatened her with a Letter of Warning for working over ten hours.

16.     On November 29, 1995, Plaintiff dropped off her work schedule to one of her

Postal customer who had asked for it in order to give her a holiday gift and shared a poem with another of her regulars.

17.    When Spiteri inadvertently learned of this exchange, he wrongly accused Plaintiff of delivering mailable matter with the intent to avoid the payment of postage and soliciting gifts, violations of postal regulations.

18.    Despite Plaintiff's lack of previous discipline, Spiteri terminated her employment.

19.    Plaintiff filed an EEO complaint but withdrew it after the termination was withdrawn and the discipline was reduced to a long term suspension.

20.    Upon her return to work, Plaintiff learned that her route had been taken away, although other carriers who had received similar discipline, had been allowed to return to their routes.

21.    Plaintiff was ordered to report to the Pontiac Post Office as an unassigned regular until a position opened for which she could bid.

22.    When Plaintiff learned that her previous assignment was up for bid, she bid on it as well as other routes in West Bloomfield but was not selected.

23.    Plaintiff remained at the Pontiac Post Office until she successfully bid on a position at the Waterford Post office where she was one of two African Americans in her section.

24.    Shortly thereafter, the Waterford Section in which Plaintiff was assigned was re-assigned to the Pontiac Post Office.

25.    She remained in Pontiac until August 1, 1998 when she successfully bid on a position in West Bloomfield.

26.    Shortly thereafter, the Waterford section was returned to the Waterford office.

## Statement of Facts

27.    When Plaintiff returned to the West Bloomfield Post Office, Joe Spiteri was still the General Manager and Mike Losiowski was a supervisor.

28.    Shortly thereafter, Plaintiff began to receive unwarranted disciplines initiated by Spiteri, Losiowski and a third white supervisor, Ron Bergum.

29.    On October 5, 1998, when Plaintiff called into the office for assistance, standard procedure when a carrier has extra mail, the evening supervisor told her that another carrier had just called in for help and, since there was no one to assist her, she should remain on the job until all of the mail was delivered.

30.     Faced with the dilemma of violating either the prohibition against working over 10 hours, a penalty overtime, or the prohibition against bringing mail back, Plaintiff, relying on that supervisor's advice, remained on the job until all of the mail was delivered.

31.     On October 9, 1998, Plaintiff was issued a Letter of Warning from her Supervisor, Ron Bergum, for working over 10 hours, a penalty overtime.

32.     When Plaintiff learned from her union steward that seven other regular carriers, white males, who had worked penalty overtime had not been issued a Letter of Warning, she filed an EEOC complaint alleging retaliation and discrimination.

33.     On October 13, 1998, Plaintiff requested assistance on her route, but it was denied.

34.     Fearful of getting another letter of warning for working overtime, Plaintiff brought back mail that she did not have time to deliver.

35.     Plaintiff was suspended for seven days by her supervisor, Ron Bergum for bringing undelivered mail back, although white, male carriers who return with undelivered mail are never disciplined.

36.     Plaintiff filed a claim of retaliation and discrimination with the EEOC based on that incident.

37.     On April 13, 1999, Plaintiff was notified by her supervisor, Mike Losiowski, that her starting time for one of her routes had been changed from 7:30 a.m. to 8:30 p.m. which would make it difficult for her to get overtime.

38.     Sometime after April 24, 1999 when Plaintiff had successfully bid out on another route, she discovered that the white, male carrier who had bid on her former route was allowed to start at 7:30 a.m.

39.     Plaintiff filed a claim of retaliation and discrimination with the EEOC based on that incident.

40.     On July 15, 1999, Plaintiff asked for a partial annual leave, which she had banked, in order to have her car serviced the following Saturday.

41.     Plaintiff's supervisor, Mike Losiowski, approved the request conditionally if he could get a substitute to cover another route, which she was not responsible for carrying, and never had a regular carrier assigned to it.

42.     On July 17, 1999, after Plaintiff did her casing, her acting supervisor, Frank Antwine, a black male, told her she could take the leave but a supervisor of another unit, Ron Bergum, advising her that he would not approve it, ordered her to split her route in four ways so that other carriers could carry it.

43.    After splitting her route, Plaintiff left work to get her car repaired and later returned to finish delivering a split of mail which was still in the office.

44.    Upon her return, Plaintiff discovered that she had only needed an hour and 43 minutes of annual leave, which she had in her bank, to make up her full eight hour day.

45.    When Plaintiff received her paycheck for that period, she discovered that supervisors Mike Losiowski and  Ron Bergum had designated her time as AOWL.

46.    After Plaintiff discovered that another carrier, a white male, had been unconditionally granted annual leave in July, she filed an EEOC claim of retaliation and discrimination.

47.    On September 13, 1999, Plaintiff reported to work at 7:30 a.m. with her uniform shirt over her street clothes, since uniforms are only required for postal employees who are out in the public and she would not be delivering her route that day and had a pre-approved doctor's appointment after she cased her route.

48.    When her supervisor, Mike Losiowski, saw what Plaintiff was wearing, he said nothing to her about being out of uniform.

49.    After Losiowski met with Spiteri, the branch manager, he brought Plaintiff's union steward over and gave her a direct order to put her full uniform on or go home.

50.    Plaintiff immediately obeyed the order and put on the rest of her uniform.

51.    On October 29, 1999 and November 10, 1999, a white male carrier came to work without wearing a uniform and was not ordered to put it on or go home.

52.    Based on this incident, Plaintiff filed an EEOC complaint of retaliation and discrimination.

53.    On October 7, 1999, Plaintiff was working her eight hours in the office casing mail that had accumulated on the route.

54.    Just prior to her punching in after lunch, her supervisor, Mike Losiowski, came into the lunchroom to get some information from her about a customer on her route.

55.    Losiowski held her past her lunch hour with the result that she punched in late.

56.    When Plaintiff received her paycheck, she could not understand why she had been given leave without pay (LWOP) for that day.

57.    When Plaintiff questioned Losiowski about this shortage, he admitted that he had ordered the timekeeper to designate this time as LWOP, usually used as a disciplinary action.

58.     Had Plaintiff known that she would be docked for this time, she could have worked longer to make the eight hours.

59.     Based on this incident, Plaintiff filed another EEOC retaliation and discrimination claim.

60.     On July 8, 2000, Plaintiff returned to her case after attending a memorial service for a co-worker to find Losiowski, no longer her supervisor, looking around her case.  She asked him what he was doing and then left her case to talk to her union steward, mumbling the word "shit" under her breath.

61.     On July 14, 2000, Mike Losiowski issued Plaintiff a letter of warning for "Improper, Offensive and Obnoxious Behavior/Failure to Follow a Direct Order."

62.     Based on this incident, Plaintiff filed yet another retaliation, discrimination claim with the EEOC.

63.     On September 25, 2000 at 11:00 a.m., Plaintiff's supervisor, Ron Bergum, told her to case only the first and second class mail and leave for the field by 12:00 noon, an instruction that none of the other carriers received.

64.     Plaintiff told Bergum that this would be impossible because of the volume of mail that day.

65.     Because there was so much first and second class mail, she was not able to finish casing until well past noon, after which she went out into the field to deliver the mail.

66.     Although she tried to deliver all of her mail, Plaintiff went into penalty overtime and still had to return with undelivered mail.

67.     On October 3, 2000, Bergum suspended Plaintiff for seven days for "Unsatisfactory Job Performance" and "Failure to Follow Instructions."

68.     Based on this incident, Plaintiff filed yet another retaliation, discrimination claim with the EEOC.

69.     Before Plaintiff left for vacation in early January 2001, she established a route delivery order for a subdivision still under construction whereby she would deliver mail to the permanent boxes in front of the houses which were occupied and would leave mail for houses under construction in temporary boxes.

70.     During her vacation, the delivery order had been changed by Ron Bergum so that all mail was being delivered to the temporary boxes only.

71.    A route inspection of her regular route had been scheduled for the week she returned from vacation.

72.    Because Bergum had assigned the changed portion of Plaintiff's route temporarily to another carrier, Plaintiff would not have known before the inspection that the route had been changed, a violation of postal regulations covering such inspections, had a fellow carrier not told her.

73.    The evening before the scheduled field inspection, after Plaintiff finished her route, she went to the subdivision under construction to look at the set up of the temporary boxes.

74.    When she discovered that there were not enough temporary boxes to accommodate all of the occupied houses in the construction area, she changed the delivery order back to the way she had previously been delivering the mail.

75.    On January 25, 2001, while Plaintiff was casing the route, she was told by Ron Bergum to deliver to the temporary boxes only but that she could deliver parcels and accountables to the boxes in front of the occupied houses.

76.    When she was delivering the route, the field inspector realized that Plaintiff was not delivering the mail in the order that Bergum had shown him.

77.    When the inspector asked her about this, Plaintiff explained that there were not enough temporary boxes to accommodate the occupied homes and that she was using the temporary boxes only for the houses still under construction.

78.    On February 7, 2001, Bergum gave Plaintiff a paper suspension for 14 days, later changed to seven days, for "Unsatisfactory Job Performance and Failure to Follow Instructions" because of her route change.

79.    Based on that incident, Plaintiff filed yet another retaliation and discrimination claim with the EEOC.

80.    On October 16, 2001, Plaintiff was issued a direct order to pull her route down by noon, which she did, and then went to lunch after her truck was loaded.

81.    At 12:15, when Plaintiff went out on the floor and found that other carriers were still casing, she realized that she was the only carrier who had been given a time limit.

82.    Plaintiff filed another EEOC claim of race and sex discrimination and retaliation for previous EEOC activity based on this incident.

83.    On April 10, 2002, Plaintiff returned to the office in time to give her outgoing mail to the truck driver who was just leaving to take such mail to the plant.

84.     Upon entering the office, Plaintiff's supervisor gave her a direct order to take her outgoing mail to the plant.

85.     When Plaintiff explained that she no longer had her outgoing mail, her supervisor accused her of disobeying a direct order.

86.     On April 23, 2002, Plaintiff was issued a Notice of Removal, termination for disobeying a direct order.

87.     After Plaintiff filed a grievance over the matter, Defendant changed the charge to a 14-day suspension.

88.     Based on this incident, Plaintiff filed an EEOC complaint of retaliation.

## COUNT I
### (Retaliation and Retaliatory Harassment)

89.     Plaintiff repeats and realleges paragraphs one (1) through (88) as if set forth more specifically, paragraph by paragraph.

90.     Title VII prohibits an employer from engaging in retaliation and retaliatory harassment for engaging in an activity protected by Title VII which prohibits

> ...an employer...[from] discriminat[ing] against any of his employees...because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation proceeding, or hearing under this subchapter. 42 U.S.C. §2000-3(a).

91.     At all times relevant to this Complaint, Plaintiff was an employee and Defendant was Plaintiff's employer.

92.     Plaintiff engaged in activity protected by Title VII when she filed her EEOC claims.

93.     Plaintiff's employer through its general manager and supervisors knew about these claims since these management employees were named as perpetrators of Title VII violations.

94.     Plaintiff was subjected to intentional severe and pervasive retaliatory harassment by the general manager and her supervisors in the form of unwarranted disciplinary actions, write-ups, suspensions and termination as follows:

> a.     She was issued a letter of warning for working a penalty overtime when she remained on the job rather than bringing mail back for which she could be disciplined;

b.  She was issued a letter of warning for bringing undelivered mail back rather than working too much overtime for which she had been disciplined;

c.  She was given a new starting time of 8:30 but the carrier who replaced her was allowed to start at the old time of 7:30;

d.  She was written up for being AWOL after her request for annual leave had been denied, although she still had leave in her bank;

e.  She was given a direct order to put on the rest of her uniform or go home although another carrier was allowed to work without his uniform on at least two occasions.

f.  She was issued a letter of warning for using a cuss word under her breath upon finding her former supervisor in her case when he did not have business there;

g.  She was written up for unsatisfactory job performance and failure to follow instructions and given a paper suspension after she discovered that there were not enough temporary boxes to deliver the mail to so she delivered it to permanent boxes in front of occupied homes as she had done previously;

h.  She was given a direct order to pull her route down by noon when other employees were allowed to remain on the floor later;

i.  She was terminated, and later suspended instead, for not taking her outgoing mail to the plant although she had already delivered it to the appropriate driver who had taken it.

## COUNT II
### (Race Discrimination and Race Harassment)

95.  Plaintiff repeats and realleges paragraphs one (1) through (94), as if set forth more specifically, paragraph by paragraph.

96.  Under Title VII of the Civil Rights Act of 1964 "[I]t shall be an unlawful employment practice for an employer…to discriminate against any individual with respect to compensation, the terms, conditions, or privileges of employment because of such individual's race…" 42 U.S.C. §2000E-2(a)(1).

97.  At all times relevant to this Complaint, Plaintiff, an African American, was an employee and Defendant was Plaintiff's employer.

98.     As an employer, Defendant owed Plaintiff a duty, pursuant to Title VII not to discriminate against her with respect to terms, conditions or privileges of employment because of her race.

99.     While employed by the defendant, Plaintiff was subjected to intentional race discrimination and harassment in violation of Title VII in the following ways:

a.     She was issued a letter of warning for working a penalty overtime when she remained on the job rather than bringing mail back although white carriers were not disciplined for such conduct;

b.     She was issued a letter of warning for bringing undelivered mail back rather than being disciplined for penalty overtime although white carriers were not disciplined for such conduct;

c.     She was given a new starting time of 8:30 but the white carrier who replaced her was allowed to start at the old time of 7:30;

d.     She was written up for being AWOL after she had been denied annual leave although she still had leave in her bank and white carriers were given unconditional leave upon request;

e.     She was given a direct order to put on the rest of her uniform or go home although a white carrier was allowed to work without his uniform on at least two occasions.

f.     She was issued a letter of warning for using a cuss word under her breath upon finding her former supervisor in her case when he did not have business there and white carriers were never written up for such conduct;

g.     She was written up for unsatisfactory job performance and failure to follow instructions and given a paper suspension after she discovered that there were not enough temporary boxes to deliver the mail to so she delivered it to permanent boxes in front of occupied homes as she had done previously and as white carriers were allowed to do;

h.     She was given a direct order to pull her route down by noon, although white employees were allowed to remain on the floor later;

i.     She was terminated, and later suspended instead, for not taking her outgoing mail to the plant when she had already delivered it to the appropriate driver who had taken it, although white carriers were never disciplined for such conduct.

## COUNT III
### (Sex Discrimination)

100.   Plaintiff repeats and realleges paragraphs (1) through (99), as if set forth more specifically, paragraph by paragraph.

101.   Under Title VII of the Civil Rights Act of 1965 "[I]t shall be an unlawful employment practice for an employer ...to discriminate against any individual with respect to compensation, the terms, conditions, or privileges of employment because of such individual's sex..." 42 U.S.C. §2000e-2(a)(l).

102.   At all times relevant to this Complaint, Plaintiff, a female, was an employee and Defendant was Plaintiff's employer.

103.   As an employer, Defendant owed Plaintiff a duty, pursuant to Title VII not to discriminate against her with respect to terms, conditions or privileges of employment because of her sex.

104.   While employed by the defendant, Plaintiff was subject to intentional sex discrimination in violation of Title VII in the following ways:

   a.   She was issued a letter of warning for working a penalty overtime when she remained on the job rather than being disciplined for bringing mail back although male carriers were not disciplined for such conduct;

   b.   She was issued a letter of warning for bringing undelivered mail back rather than being disciplined for penalty overtime although male carriers were not disciplined for such conduct;

   c.   She was given a new starting time of 8:30 but the male carrier who replaced her was allowed to start at the old time of 7:30;

   d.   She was written up for being AWOL after she had been denied annual leave although she still had leave in her bank;

   e.   She was given a direct order to put on the rest of her uniform or go home although a male carrier was allowed to work without his uniform on at least two occasions.

   f.   She was issued a letter of warning for using a cuss word under her breath upon finding her former supervisor in her case when he did not have business there although male carriers were not disciplined for such conduct;

   g.   She was written up for unsatisfactory job performance and failure to follow instructions and given a paper suspension after she discovered that there were not enough temporary boxes to deliver the mail to so she delivered it to permanent boxes in front of occupied homes as she had

done previously and as male carriers were allowed to do;

h.   She was given a direct order to pull her route down by noon when male employees were allowed to remain on the floor later;

i.   She was terminated, and later suspended instead, for not taking her outgoing mail to the plant when she had already delivered it to the appropriate driver who had taken it although male carriers had never been disciplined for such conduct.

## DAMAGES

As a direct and proximate result of Defendant's unlawful employment practices and violations of statutory law by Defendant, Plaintiff KAREN PATILLO has sustained and continues to sustain loss of earnings, seniority, promotional opportunities and/or upgrading and the accompanying decision-making responsibilities, professional standing and status in the community and has suffered irreparable harm to her career and upward mobility and the equal opportunity to pursue her gainful occupation and will so suffer in the future.

As a direct and proximate result of Defendant's unlawful employment practices and violations of statutory law, Plaintiff KAREN PATILLO has sustained and continues to sustain damages by way of extreme mental anguish, outrage, emotional distress, severe anxiety about her future ability to support herself and family, painful humiliation and embarrassment among friends and co-workers, undermining of self esteem and motivation and loss of the ordinary pleasures of everyday life.

## RELIEF REQUESTED

Plaintiff KAREN PATILLO respectfully requests that this Court order the following legal and equitable relief:

- Declare that Defendant has violated Title VII by denying her her rights under that Act.
- Declare that Defendant has violated Title VII by retaliating and committing retaliatory harassment against her for exercising her rights under that Act.

- Declare that Defendant has violated Title VII by discriminating against her because of her race.
- Declare that Defendant has violated Title VII by discriminating against her because of her sex.
- Award her compensatory damages, including damages for loss of income, lost benefits and emotional distress.
- Award her costs and attorney fees.
- Award her any and all other relief that this Court deems just.

Respectfully submitted,

HELVESTON & HELVESTON, P.C.

Mary Anne M. Helveston
Attorney for Plaintiff

Date: March 23, 2004

## JURY DEMAND

Plaintiff KAREN PATILLO, by and through her attorneys, hereby demands a trial by jury.

Respectfully Submitted,

HELVESTON & HELVESTON, P. C.

DATE: *March 23, 2004*

By: _____
Mary Anne M. Helveston
Attorney for Plaintiff



JAN 2 7 2004

## UNITED STATES POSTAL SERVICE
## GREAT LAKES OFFICE
## EQUAL EMPLOYMENT OPPORTUNITY CASE

### IN THE MATTER OF:

| | |
|---|---|
| Karen Patillo,<br>Complainant, | ) <br> ) <br> ) |
| v.<br>John E. Potter,<br>Postmaster General, | ) <br> ) <br> ) <br> ) |
| United States Postal Service,<br>Respondent, | ) <br> ) <br> ) <br> ) |

Case Nos.    4-J-480-0027-99
                      4-J-480-0016-02

Filed on    November 20, 1998
                  January 14, 2002

### FINAL AGENCY DECISION

This is the final agency decision of the U. S. Postal Service in the matters referenced below.

### Case # 4-J-480-0027-99

Complainant alleged discrimination on the bases of race (Black), sex (Female), and age (8/24/52), and retaliation (multiple cases cited, Complainant has filed a total of 16 complaints), when on October 5, 1998 she was issued a Letter of Warning for penalty overtime; on April 13, 1999 her starting time was changed; on July 17, 1999 she was charged with 1.43 hours of AWOL; on September 3, 1999 she was given a direct order to wear her uniform; and on January 7, 1999 she was charge .09 units of LWOP.

### Case # 4-J-480-0016-02

Complainant alleged discrimination on the bases of race (Black), sex (Female), and retaliation when on October 16, 2001 she was given a direct order to pull down her route by 12:00 noon, while other carriers who were in the office after 12:00 noon were not given the same order.  The Complainant further alleged discrimination when on April 10, 2002 she was given a direct order to take mail to the plant; and on April 24, 2002 she was issued a Notice of Removal for failure to follow instructions.

The complaints were processed by an Equal Employment Opportunity Investigator, after which a copy of the Investigative Reports were transmitted to Complainant.  Following receipt of those reports Complainant had 30 days in which to request a hearing before an Administrative Judge (AJ) of the Equal Employment Opportunity Commission (EEOC) or a final agency decision without a hearing.

The Complainant requested a hearing.  On May 21, 2002, the EEOC District Office received Complainant's request to withdraw her request for a hearing. Administrative Judge Deborah M. Barno returned the complaint files for a final agency decision without a hearing in accordance with 29 CFR §1614.110.

## ANALYSIS

In any proceeding, either administrative or judicial involving an allegation of discrimination, it is the burden of the Complainant, to initially establish that there is some substance to her allegation. In order to accomplish this burden, the Complainant must establish a *prima facie* case of discrimination.  See McDonnell Douglas Corp. v Green, 411 U.S. 792, 802  (1973);  Furnco Construction Corp.v. Waters, 438 U.S. 567,576 (1978).   This means that the Complainant must present a body of evidence, such that, were it not rebutted, the trier of facts could conclude that unlawful discrimination did occur. The burden then shifts to the agency to articulate a legitimate, nondiscriminatory explanation for its action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  In this regard, the agency need only produce evidence sufficient, "to allow the trier of facts to rationally conclude," that the agency's action was not based on unlawful discrimination. Id. At 257.  Once the agency has articulated such a reason, the question becomes whether the proffered explanation was the true reason for the agency's action, or merely a pretext for discrimination.  In St. Mary's Honor Center v. Hicks 113 U.S.2742 the Supreme Court held that the Complainant must show both that the reason was false, and that discrimination was the real reason for the employment action.

To prevail on a claim of unlawful discrimination, a complainant must satisfy the three-part evidentiary scheme in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). A complainant must initially establish, by preponderance of evidence, a *prima facie* case of discrimination. The *prima facie* elements are determined by the circumstances of the case and the bases of discrimination alleged.

In order to establish a *prima facie* case of disparate treatment, a complainant must show that he is a member of a protected group and that he was treated less favorably than other similarly situated employees outside of his protected group. Potter v. Goodwill Industries of Cleveland, 518 F.2d 864, 865 (6th Cir.

1975). In order for comparative employees to be considered similarly situated, all relevant aspects of complainant's employment situation must be nearly identical to those of the comparative employees. Payne v. Illinois Central R.R., 665 F.Supp. 1038, 1043 (W.D. Tenn. 1987). To establish a *prima facie* case where age is a basis, the complainant could compare himself to a similarly situated employee within his protected group who significantly younger. O'Connor v. Consolidated Coin Caterara Corp., 517 U.S. 308, 311-12 (1996). The general guidelines for establishing a *prima facie* case are found in McDonnell Douglas Corp. v. Green, supra.   But in making a determination as to whether Complainant has established a *prima facie* case, it must be recognized that each of the Complainant's allegation of discrimination is premised upon a particular set of facts; therefore, the evidence required to establish a *prima facie* varies from one case to the next.  In order for Complainant to establish a prima facie of discrimination, Complainant must first show that: (1) he is a member of the protected group; (2) he was subjected to an adverse employment action; and (3) he was treated less favorably than similarly situated employees who are not members of his protected groups. See, McDonnell Douglas, supra. at 802-804.

To establish a prima facie case of reprisal discrimination, a complainant must show that: (1) he engaged in prior protected activity: (2) the agency official(s) was aware of the protected activity; (3) he was subsequently disadvantaged by an adverse action; and (4) there is a causal link between the protected activity and the adverse action. Hochstadt v. Worcester Foundation for Experimental Biology, Inc., 425 F.Supp. 318, 324 (D.Mass.), afl'd, 545 F.2d 222 (1st Cir. 1976); Manoharan v. Columbia University College of Physicians and Surgeons, 842 F.2d 590, 593 (2nd Cir. 1988). The causal connection may be shown by evidence that the adverse action followed the protected activity within such a period of time and in such a manner that a reprisal motive is inferred. Grant v. Bethlehem Steel Corp., 622 F.2d 43 (2nd Cir. 1980). To support a finding of unlawful retaliation, there must be proof that the agency official(s) took the action at issue because of complainant's prior protected activity and sought to deter complainant or others. EEOC Compliance Manual on Retaliation, No. 915.003 (May 20, 1998) p. 8-16.

At the time of the alleged discriminatory act Complainant was a Full-time City Carrier assigned to the Pontiac Post Office in Pontiac, MI.

**Case # 4-J-480-0027-99**

**Issue # 1**

The Complainant alleged that she was issued a Letter of Warning for penalty overtime on October 5, 1998 because of her race, sex age and retaliation for prior EEO complaints.

Complainant stated that on October *5,* 1998 she was assigned to deliver Route

2201.   At 11:00 a.m. she submitted a PS Form 3996 (Carrier- Auxillary Control) requesting two (2) hours of overtime to deliver her route.  Record evidence revealed the Complainant was granted the two hours of overtime as requested on PS Form 3996.   At 2:00 p.m. the Complainant left for the street and she stated at approximately 5:00 p.m. it became apparent that she was going to need more time; therefore, she called the Post Office from a customer's house to inform management that she would not be able to complete the route in 10 hours as she originally thought.  Since, Ron Bergum, her immediate supervisor, was not in the office, she spoke with Millie Crittenden, the P.M. Supervisor. (Affidavit A) (Exhibit 4)

Complainant further stated that Supervisor Crittenden informed her that she did not have any help (auxillary assistance) because Mary Capristrant (White Female 42) called-in and Crittenden sent PTF Carrier Jose Maninang out to help her.  Complainant stated that Supervisor Crittenden told her to deliver all the mail as Branch Manager Joe Spiteri had instructed because no mail was to be brought back. Complainant indicated that there was a service talk about not working penalty overtime; however, they were also instructed to not bring mail back.  The Complainant stated that she finished delivering the route and ended up working .81 hundredths of an hour over 10 hours.  Record evidence revealed the Complainant began her tour at 7:34 a.m. on October 5, 1998; she left the office at 2:05 p.m.; returned at 6:44 p.m. and ended her tour at 6: 53 p.m. (Affidavit A) (Exhibit 9)

Record evidence revealed that the Complainant was issued a letter of warning dated October 9, 1998 for failure to follow instructions when she failed to notify her supervisor that she was unable to complete her assignment in the authorized time, resulting in .81 units of penalty overtime.          (Exhibit 2)

The Complainant filed a grievance on issuance of the Letter of Warning through the grievance arbitration procedure.  Record evidence revealed the grievance was settled at Step 2 of the grievance process.  The Step 2 Settlement Decision dated December 29, 1998, indicated that the letter of warning would be expunged from Complainant's record.     (Exhibit 6)

Ronald A Bergum, Supervisor, Customer Service, stated that the policy regarding carriers working over eight (8) hours states that, "all carriers are to identify through the use of Form 3996 the need for auxiliary assistance or overtime after the last receipt of mail in the morning".   If a problem arises during the course of the day in the field, the carrier is to call the office by 3:00 p.m. and inform management.  He stated management can then decide if assistance should be offered or overtime is allowed.  He further stated that if an employee does not call the office until after 5:00 p.m., Millie Cnttenden, the Window Supervisor, is on duty.  Also, if an employee's call was made at that late hour, there would be few options available, either deliver the mail or bring it back and have non-delivery until the next day.     (Affidavit E)

The Complainant (Black Female 47) alleged that Tyrone Sparks (Black Male 39); Bill Miller (White Male 41); Pete Chandler (White Male 37); Ronald Jones (Black Male 45); Janie Thompson (White Female 49); Barbara Crick (White Female 45); and Linda Robinson (Black Female 49) all worked penalty overtime. (Affidavit A)

Bergum indicated that the only carriers who worked penalty overtime in his unit on October 5, 1998, were the Complainant and Linda Robinson.  He stated that the Complainant worked .81 units over 10 hours and Ms. Robinson worked .22 units over 10 hours.  Bergum further stated that he may have had a discussion with Ms. Robinson concerning her penalty overtime; however, he did not have a record of a discussion.  Record evidence revealed the Complainant (Black Female 47) worked .81 units (48 minutes) over 10 hours, Linda Robinson (Black Female 49) worked .22 units (13 minutes) over 10 hours and Bill Miller (White Male 41) worked .01units (less than 1 minute) over 10 hours.  Record evidence revealed the Complainant was the only employee who was issued discipline for failing to follow instructions when she incurred penalty overtime.  The record further showed that the Complainant was a T-6 Carrier Technician while Robinson and Miller were regular carriers.  As a result, these employees's were not similarly situated to Complainant.       (Affidavit E)   (Exhibits 2, 8, 9)

Complainant failed to establish a prima facie case of race, sex, age and retaliation discrimination.  While the Complainant may believe that the Postal Service was motivated by race, sex, age and retaliation discrimination, that belief is unsupported by credible evidence.  In this instant, the Complainant named employee's whose race were Black and White; Males and Females and employees' who were over 40 years old and under forty years old.  The Complainant failed to name a similarly situated employee who was treated more favorably than she under similar circumstances.  Further, the record showed three carriers',  two Black employees' (Complainant included) and one White employee; of which two were female employees (Complainant included) and one a male employee; worked penalty overtime on October 5, 1998.  Of these three employee's, only the Complainant received discipline for failing to follow instructions when she incurred penalty overtime.  Complainant failed to establish that she was discriminated against in this instant.        (Affidavits A-C) (Exhibits 1-9)

The Complainant further failed to establish a prima facie case of retaliation. Record evidence revealed the Complainant filed numerous prior EEO complaints.  Complainant failed to establish a causal link between the protected activity and her receiving the Letter of Warning.  Record evidence revealed the latest EEO complaint filed by the Complainant prior to this instant complaint was Case # 4-J-480-0030-99, file on April 4, 1997 and dismissed on May 9, 1997. Complainant further failed to prove that the agency official(s) took the actions at issue because of her prior protected activity and sought to deter Complainant or

others.  Further, the Complainant failed to prove that the agency's reason for their actions were pretext for masking intentional retaliation discrimination. (Affidavit A-F)   (Exhibit 23-25)

## Issue # 2

The Complainant alleged that on April 13, 1999 her starting time was changed because of her race, sex, age and retaliation. Complainant stated that on August 1, 1998, she was awarded a swing assignment which included route 2485.  She further stated that on April 13, 1999, when she returned from the field, there was a copy of a change in starting time from Supervisor Mike Losiowski, changing her starting time from 7:30 a. m. to 8:30 a. m.  Complainant stated that she bid off the swing assignment on April 24, 1999; and Rickey Odom was awarded the swing bid assignment.  The Complainant alleged that Rickey Odom was allowed to start at 7:30 a. m.; and his starting time was not changed to 8:30 a.m.   As a result, the Complainant alleged that her starting time was changed on April 13, 1999 due to sex discrimination and retaliation for prior EEO activity. (Affidavit A)   (Exhibit 11)

Michael Losiowski, Supervisor, Customer Services, stated that the Complainant's starting time was changed on only one (1) route (6 ½ hour auxiliary route), of the Complainant's five (5) route T-6 string assignment.  He further stated that the starting time was also changed for the subs (Part-time Flexibles) that delivered it. Losiowski indicated that if Ricky Odom (Black Male 44) wasn't allowed to start early (7:30 a.m.) on a day that he delivered that route, it was because he had extra duties that didn't include coming in to work that route. (Affidavit D)   (Exhibit 12)

Complainant failed to establish a prima facie case of race, sex, age and retaliation discrimination.  While the Complainant may believe that the Postal Service was motivated by race, sex, age and retaliation discrimination, that belief is unsupported by credible evidence.   The Complainant failed to name a similarly situated employee who was treated more favorably than she under similar circumstances. Further, the record failed to establish that a similarly situated employee was treated more favorably than she under similar circumstances.

The Complainant further failed to establish a prima facie case of retaliation. Record evidence revealed the Complainant filed numerous prior EEO complaints.  Complainant failed to establish a causal link between the protected activity and her starting time being changed.  Record evidence revealed the latest EEO complaint filed by the Complainant prior to this instant complaint was Case # 4-J-480-0030-99, file on April 4, 1997 and dismissed on May 9, 1997. Complainant further failed to prove that the agency official(s) took the actions at issue because of her prior protected activity and sought to deter Complainant or others.  Losiowski indicated that he was not aware of the Complainant EEO

activity at the time her starting time was changed.  Further, the Complainant failed to prove that the agency's reason for their actions were pretext for masking intentional retaliation discrimination.      (Affidavit A-F)     (Exhibit 23-25)


**Issue # 3**

The Complainant alleged that on July 17, 1999 she was charged AWOL for 1.43 hours because of her race, sex, age and retaliation.  Complainant stated that on July 14, 1999, she was having car problems and needed to have some repairs. She states that because her car is considered foreign, she had to have parts ordered and the mechanic said they would be in on Saturday, July 17, 1999. She states that on July 15, 1999, she submitted a PS Form 3971 for annual leave after casing her route on July 17, 1999, to her supervisor, Mike Losiowski. Complainant stated that Losiowski didn't give her an answer at that time nor did he inform her that he wouldn't be there on Saturday, July 17, 1999.  She stated that when she got to work on July 17, 1999, Ron Bergum and a 204-B supervisor named Frank were the supervisors.  She explained to Bergum that she had to leave to have her car serviced and Bergum told her no at first, then Frank said she could go and Mr. Bergum came over and had her split her route four (4) ways.  Complainant further indicated that she left and took care of her car. When she returned she brought back paper work showing she had her car serviced; then she carried the first part of her route.  The Complainant indicated that she put in for 1. 43 hours of annual leave.   However, she was unaware that she was charged AWOL (Absent Without Leave) until she received her check for that time period.      (Affidavit A)

Complainant alleged that she was discriminated against because of her race because Joe Petrucha (White Male) had his car break down that Monday in the field and Losiowski gave him two days to get it fixed.  She further stated that other carriers; Linda Lacata (White Female) was given time off after casing mail on July 29, 1999 and John Monier (White Male) was given time off after casing mail on July 28, 1999.  She stated that neither, Lacata or Monier were charged with AWOL and neither of them came back and worked.  She further stated that Daryl Whitefield (White Male) was given the entire day of July 27, 1999 off when he asked for it.              (Affidavit B)

Record evidence revealed that on July 15, 1999, the Complainant requested annual leave for July 17, 1999.  The Complainant did not indicate on the PS Form 3971, how many hours that she was requesting.   Supervisor Losiowski Disapproved the Complainant's request on July 15, 1999, indicating "Can't approve at this time, no help on Saturday - Route 2485- if PTF available on Saturday it will be approved".       (Exhibit 14)

The record contained a car repair bill dated July 17, 1999 indicating the Complainant had her car serviced on that date.   The Complainant submitted a

PS Form 3971 dated July 17, 1999 requesting 1.43 hours of leave that was charged to AWOL.   Supervisor Bergum signed the PS Form 3971 as notified, and Supervisor Losiowski signed the form as the Complainant's supervisor. (Exhibits 15-16)

Supervisor Losiowski stated that on July 15, 1999, the Complainant approached him about time off on Saturday, July 17, 1999.  He explained to the Complainant that if they had help available she could have it off, but apparently the help wasn't available.  He believed the Complainant left work when she was told not to; and as a result she was AWOL.  He further indicated that Joe Petrucha (White Male) is a rural carrier; therefore he is in a different craft than Complainant.   He indicated that the other cited employees had approved leave on different days when carrier help was available.        (Affidavit D)

Supervisor Ronald Bergum states he doesn't remember every detail of that day. He stated that if the Complainant was denied an annual leave request, it could be because no straight time assistance was available.  He further stated that if an employee request annual leave, the leave is denied and the employee doesn't show up for work, that employee may be charged with AWOL.  Bergum indicated that like any company, the replacement cost of carriers is possibly going to be at an overtime rate.              (Affidavit E)

Complainant failed to establish a prima facie case of race, sex, age and retaliation discrimination.  While the Complainant may believe that the Postal Service was motivated by race, sex, age and retaliation discrimination, that belief is unsupported by credible evidence.   The Complainant failed to establish that she received approval to leave the building to get her car service on July 17, 1999.  Testimony and record evidence revealed the Complainant's request was disapproved pending help was available.  The Complainant failed to establish help was available when she left the facility to get her car repaired. Complainant failed to establish that she was discriminated against in this instant. (Affidavits A-D)        (Exhibits 14-16)


## Issue # 4

The Complainant alleged that on September 3, 1999 she was given a direct order to wear her uniform.  Complainant states that on September 3, 1999, she came in at 7:30 a.m. to case her route and leave because she had a doctor's appointment.  She states she had her uniform top on over her clothes.  Then at approximately 8:00 a.m., Supervisor Mike Losiowski brought her union steward, Bill Miller, to give Complainant a direct order to put on her uniform or go home. Complainant states Losiowski explained this instruction came from Branch Manager Joe Spiteri.  Complainant stated that she asked Mr. Spiteri about this and he told her that when she's on the clock she's to be in uniform.   She stated that she then went and put her uniform on.              (Affidavit B)

Complainant states that on October 29, 1999, Pete Chandler (White, Male, 37), came in on light duty in his street clothes; however, no one told him to change or go home. She states that on November 10, 1999, Chandler again came in wearing his street clothes and management said nothing to him. She states that Manager Spiteri gave a service talk that day but Spiteri didn't say anything to Pete Chandler about his street clothes. She further states that Mr. Chandler had a talk with Supervisor Mike Losiowski and Losiowski did not tell him to change or give him a direct order not to come in wearing street clothes. Complainant states that because she is different and her clothes are different (her clothes are from India), she can't wear her street clothes when she's just casing mail. (Affidavit B)

Supervisor Michael Losiowski stated that the office policy is to be in uniform even if you're just casing mail. He stated the Complainant's clothes were a safety hazard as they were very loose and could easily have been caught on equipment. Losiowski further stated that Pete Chandler is not under his supervision and he doesn't recall speaking to Chandler while he was in street clothes.          (Affidavit D)

Joseph Spiteri, Branch Manager, stated that there policy is that no one is to come in wearing street clothes unless a prior request was made to a supervisor for approval. The supervisor must have justification to approve the request. He further stated that the Complainant was given prior instructions as were all employees that they are to come to work in their uniform. He states that Complainant did not request permission to wear street clothes on the day in question; therefore she was instructed to change. Spiteri stated that Complainant had known this was going to be a problem because she had a uniform in her locker and immediately changed. He stated that he is not aware of the situation with Mr. Chandler and leaves it up to the floor supervisors to ensure policies are enforced.          (Affidavit C)

Complainant failed to establish a prima facie case of race, sex, age and retaliation discrimination. While the Complainant may believe that the Postal Service was motivated by race, sex, age and retaliation discrimination, that belief is unsupported by credible evidence. The Complainant failed to name a similarly situated employee who was treated more favorably than she when she when she was told to change into her uniform. Further, the record was void of any similarly situated non-disabled employee who was treated more favorably than Complainant. Complainant failed to establish that she was discriminated against in this instant.          (Affidavits A-E)


**Issue # 5**

The Complainant alleged that on January 7, 1999 she was charge .09 units of

LWOP because of retaliation.   Complainant indicated that on October 7, 1999, she didn't deliver mail; she worked 8 hours in the office casing mail that had accumulated on the route.  She states while she was having her lunch in the swing room, Supervisor Mike Losiowski came in to ask her something about the route.  She stated that when she received her paycheck on October 15, 1999, she noticed she had .09 units of LWOP (Leave Without Pay) and she didn't know why.  She asked Losiowski what happened and he explained that she had gone over her lunchtime on October 7, 1999 and that he had informed the timekeeper to just give her LWOP for the units she was short. She stated this was done without ever telling her.  Complainant stated that when this has happened in the past the supervisor always brought it to her attention and gave her the option of what to take for the time she was short.  Complainant believes the office policy for whenever somebody is short 8 hours is that the supervisor will bring it to your attention and let the employee make the decision if she/he want to use annual leave or leave without pay.  The Complainant did not name a comparison employee in this instant.  The Complainant alleged that this incident was a result of retaliation for her prior EEO activity.
(Affidavit B)    (Exhibit 21)

Supervisor Losiowski, stated that when an employee is short units for an eight (8) hour day and haven't turned in a P S Form 3971 requesting annual, it may be recorded as LWOP.  This has happened with many carriers when they are short 8 hours.  As far as this being used against a carrier for disciplinary purposes, it would only be used if it were unscheduled        (Affidavit D)

The Complainant further failed to establish a prima facie case of retaliation.  Record evidence revealed the Complainant filed numerous prior EEO complaints.  Complainant failed to establish a causal link between the protected activity and her starting time being changed.  Record evidence revealed the latest EEO complaint filed by the Complainant prior to this instant complaint was Case # 4-J-480-0030-99, file on April 4, 1997 and dismissed on May 9, 1997.  Complainant further failed to prove that the agency official(s) took the actions at issue because of her prior protected activity and sought to deter Complainant or others.  Losiowski indicated that he was not aware of the Complainant EEO activity.  Further, the Complainant failed to prove that the agency's reason for their actions were pretext for masking intentional retaliation discrimination.
(Affidavit A-E)    (Exhibit 23-25)

Under the facts of this case, there is no casual connection between the Complainant's race and sex, age or retaliation based on the above five (5) claims alleged.  The complainant has submitted absolutely no evidence whatsoever that would establish such a connection.     (Affidavit A-E)    (Exhibit 1-29)

**Case # 4-J-480-0016-02**

**Issue # 1**

The Complainant alleged that on October 16, 2001 she was given a direct order to pull down her route by 12:00 noon, while other carriers who were in the office after 12:00 noon were not given the same order. The Complainant stated that on October 16, 2001 she was given a direct order to pull down her route by 12:00 noon. She alleges that she had already pulled down her route and loaded her truck, then remained at the post office for her lunch break. The Complainant further stated that she ended her lunch break at 12:15 p.m. and went back out on the floor and saw nine other carriers still in the office and nothing was said to them. The Complainant alleged that she was discriminated against because of her race and retaliation because nothing was said to the nine carriers in the office. The Complainant did not name the nine comparison carriers. (Affidavit A)

Manager Joe Spiteri stated that the Complainant had previously gone through a route inspection that adjusted her route to eight (8) hours. Spiteri further stated that management was concerned about the Complainant continuing to use overtime on a daily basis after her route was adjusted; bringing back mail without completing her assignment and her inability to return to the office before the dispatch truck left the facility with the outgoing mail. As a result, the Complainant was given a direct order to pull down her route by noon so that she could complete her assignment and return to the office before the dispatch truck left the facility.          (Affidavit B)

Supervisor Mildred Crittenden stated that the Complainant's Route 2201 was adjusted to 8 hours in 2001. Prior to the adjustment she was in the office late before going into the field to deliver mail and she returned late, having to work overtime. She indicated that she gave the Complainant the direct order to pull down her route by noon because the Complainant would leave the office late to deliver mail and she would visit other units instead of staying at her case and casing mail. As a result, the Complainant was not making dispatch at night, bringing back part of her route; and working overtime.          (Affidavit C)

The Complainant filed a grievance on being given a direct order to be out of the office by a certain time. A Step B Decision dated May 6, 2002, resolved the grievance indicating that for the efficiency of the Postal Service management is to manage the grievant's route as required by the M-39, Section 111 and 122.22 and not to give the grievant a blanket order to leave the office by 12:30 p.m. each day.          (Exhibit 5)

Complainant failed to establish a prima facie case of race and retaliation discrimination. While the Complainant may believe that the Postal Service was motivated by race and retaliation discrimination, that belief is unsupported by

credible evidence.   Moreover, Complainant failed to name a similarly situated employee who was treated more favorably than she under similar circumstances. Testimony revealed that the Complainant was given a direct order to pull down her route by noon so that she could complete her assignment and return to the office before the dispatch truck left the facility because she continued to use overtime on a daily basis after her route was adjusted; bring back mail without completing her assignment and not return to the office before the dispatch truck left the facility with the outgoing mail.  Supervisor Crittenden stated that the Complainant is the only employee whom she gave a direct order to pull down her mail by 12:00 p.m.; however she has given a direct order to Tyrone Sparks (Black) and Clayton Freels (Black) to pull down their mail at 1:00 p.m. Crittenden indicated that five Black carriers' and two White carriers' were supervised by her during the period in question.   Further, Crittenden indicated that she was not aware of any EEO activity in her unit or in the facility. (Affidavits A-C)     (Exhibit 5)


**Issue # 2**

The Complainant alleged that on April 10, 2002 she was given a direct order to take mail to the plant; and on April 24, 2002 she was issued a Notice of Removal for failure to follow instructions.

The Complainant stated that when she returned to the office (after completing her route) on April 10, 2002, Supervisor Gwen Webster told her to take her outgoing mail to the Plant.  The Complainant stated that she informed Webster that she did not have any outgoing mail and Webster said" What did you do with your mail".   The Complainant replied stating that she had already given her mail to the truck driver.  Webster then stated, "No you did not he is gone"!  The Complainant stated she replied" Ok I was not going to argue with her ".  The Complainant further stated that Webster gave her a direct order to take her outgoing mail to the Plant and she said" I don't have any out going mail", and "she said are you disobeying a direct order", and the Complainant said "yes" because she didn't have any mail.   The Complainant further indicated that she was given a pre-disciplinary interview on April 15, 2002; and she was issued a Notice of Removal on April 24, 2002.  The Complainant alleged that on April 10, 2002, an employee named "Tyrone" (no last name) was still out delivering mail and Webster did not give him a direct order.  As a result, Complainant alleged that she was discriminated against because of her race, sex and retaliation. (Affidavit A)

Record evidence revealed the Complainant was issued a Notice of Removal dated April 23, 2002 fro failure to follow instructions/insubordination.  Supervisor Gwendolyn Webster issued the Notice of Removal and Manager Spiteri concurred with the issuance.        (Exhibit 3)

The Complainant indicated that the Notice of Removal was reduced to a 14 day suspension in the grievance process. Record evidence revealed that a grievance was filed on the notice of removal through the grievance arbitration procedure. In a Step B Decision dated May 28, 2002, that decision indicated that due to mitigating circumstances, the Notice of Removal will be reduced to a no time-off 14-day suspension and remain on the Complainant's record for a period of eighteen months, to be removed on 10/23/03 providing there is no further discipline for the same infraction. Record evidence revealed that on April 10, 2002 the Complainant returned from her route at approximately 6:40 p.m. and the last dispatch truck left at 6:30 p m. Record evidence further revealed that Supervisor Webster found approximately 12 pieces of outgoing mail at the Complainant's route in a hamper that she personally drove to the Plant to prevent a delay in processing of the mail. The Complainant submitted a statement dated April 15, 2002 which stated, "I Kenny Woodward Wednesday April 10[th] received Karen's outgoing mail before pulling out". The April 15, 2002 statement was not signed by Kenny Woodward.    (Affidavit A) (Exhibit 3)

Supervisor Gwendolyn Webster stated that the Complainant received a Notice of Removal for failure to follow instructions by delaying the processing and delivery of first class mail. She indicated that on the day in question the Complainant arrived back from her route after the truck driver left and she had first class mail that needed to be taken to the Plant to be processed. She further indicated that she then instructed the Complainant to take the mail to the plant, and she refused. Webster stated that she then gave the Complainant a direct order and she again refused. Webster stated that the Post Office has a zero tolerance for knowingly delaying the processing and delivery of mail.       (Affidavit D)

The record contained a statement from Mary Capistrant dated May 3, 2002, who indicated that Supervisor Webster informed her when she returned late to the office, that she had to take her outgoing mail to the Plant (General Mail Facility). (Exhibit 3)

Complainant failed to establish a prima facie case of race, sex and retaliation discrimination. While the Complainant may believe that the Postal Service was motivated by race, sex and retaliation discrimination, that belief is unsupported by credible evidence. Moreover, Complainant failed to name a similarly situated employee who was treated more favorably than she under similar circumstances. Webster indicated that she did not supervise the employee named by the Complainant; nor did she know that this employee refused a direct order. Webster further indicated that other than the Complainant, she has never had an employee to refuse a direct order. Record evidence revealed that four City Carriers (Complainant included) were issued Letters of Removal. Of these employees' two were Black Females (Complainant included) and two were White Males. Records further revealed that of these employees, the Complainant was the only carrier that Supervisor Webster issued a Notice of Removal. The record was void of any evidence showing the other three carriers' who were issued

Letters of Removal were involved in prior EEO activity. Therefore, the record was void of a similarly situated employee who was treated more favorably than Complainant.        (Affidavits A-D)      (Exhibits 1-12)

Under the facts of this case, there is no casual connection between the Complainant's race and sex or retaliation based on the claims alleged. The complainant has submitted absolutely no evidence whatsoever that would establish such a connection.                    (Affidavits A-D)    (Exhibits 1-12)

Even assuming that a prima facie case of discrimination was arguably established, the evidence in this case does not support a finding that the factors cited by Complainant were a determining factor in these complaints.   Testimony and record evidence indicated that Complainant further failed to meet the burden of establishing that the agency's actions were not credible or were a pretext to mask prohibited discrimination.  Complainant has not presented any evidence to indicate that any agency official harbored a discriminatory animus towards her.

## CONCLUSION

The Postal Service is closing this case with a finding of no discrimination based on race, sex, age and retaliation.

## APPEAL PROCEDURES

You have the right to appeal the Postal Service's final agency decision to the:

**Office of Federal Operations
Equal Employment Opportunity Commission
Post Office Box 19848
Washington, D. C. 20036-9848**

within thirty (30) calendar days of the date of your receipt of the Postal Service's final action. You must submit any statement or brief in support of that appeal within thirty (30) days of the date of the appeal. You must use EEOC Form 573, a copy of which is enclosed, in connection with your appeal. You may also deliver your appeal in person or by facsimile provided that briefs filed by facsimile are ten or fewer pages in length. **You must provide the Postal Service with a copy of your appeal and any supporting statement or brief.**

**Send a copy of your appeal and any supporting statement or brief to the:**

> **Manager, EEO Compliance and Appeals**
> **Great Lakes/Midwest Area Office**
> **244 Knollwood Drive- 2nd Floor**
> **Bloomingdale, IL 60117-3010**

You have the right to file a civil action in an appropriate U. S. District Court within ninety (90) calendar days of the date of your receipt of the Postal Service's final action, within ninety (90) calendar days of the EEOC's final decision on any appeal, or after 180 days from the date of filing of an appeal with the EEOC if no final decision has been rendered. Should you choose to file a civil action, your filing should be styled (Your Name v. John E. Potter, Postmaster General). If you do not have or cannot afford an attorney, you may request that the court appoint an attorney to represent you and that the court permit you to file the civil action without the payment of fees, costs, or other security. Whether these requests are granted or denied is within the sole discretion of the District Judge. These requests must also be filed within the same ninety-day time period for filing the civil action.

_1/22/04_
Date

Michael L. Garrett
Manager, EEO Compliance and Appeals

Enclosures

## CERTIFICATE OF SERVICE

**For timeliness purposes, it will be presumed that this Notice of Final Decision was received within five (5) calendar days after it was mailed. I certify that on this date, this Notice of Final Decision was mailed to the following parties:**

Mary Anne Helveston
Helveston & Helveston, P.C.
66 Cadillac Square, Suite 3327
Detroit, MI  48226-2881

Karen Patillo
300 Eagle Pond Drive, Apt. 147
Walled Lake, MI  48390-3061

Manager EEO Dispute Resolution
Royal Oak District

1/22/04
Date

60117-3010:VBC
1/20/04

JS-44 11/99

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE:   Oakland

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.

04-71070

## I. (a) PLAINTIFFS

Borman/71070/RSW

Karen Patillo

**DEFENDANTS**

John E. Potter, Postmaster General
United States Postal Service

(b) County of Residence of First Listed:   Oakland

County of Residence of First Listed
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorneys (Name, Address and Telephone Number)
Mary Anne M. Helveston
Helveston & Helveston, P.C.
65 Cadillac Sq., Suite 3327
Detroit, MI  48226    (313) 963-7220

Attorneys (If Known)

PAUL D. BORMAN
MAGISTRATE JUDGE R. STEVEN WHALEN

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLA | DEF | | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal of Business In This State | ☐ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment and Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel And Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury— Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21: 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☒ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
  Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Title VII of Civil Rights Act of 1964 (Title VII) and Civil Rights Act of 1991 (CRA)    Race and Sex Discrimination;   Retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$ DEMAND  $75,000+

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD
X _____

**PURSUANT TO LOCAL RULE 83.11**

1. Is this a case that has been previously discontinued or dismissed?   ☐ YES   ☑ NO

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____

2. Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court?  (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)   ☐ YES   ☑ NO

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____

Notes: